UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MIIA C. D'AGOSTINO,            )
                              )
          Plaintiff,          )
     v.                       )          CIVIL ACTION
                              )          NO.  12-11628-DJC
FEDERAL INSURANCE             )
COMPANY, et al.,              )
                              )
          Defendants.         )

**REPORT AND RECOMMENDATION ON DEFENDANT'S
EMERGENCY MOTION TO ENFORCE SETTLEMENT
AGREEMENT AND ORDER ON DEFENDANT'S MOTIONS
FOR PROTECTIVE ORDER AND FOR SANCTIONS**

June 17, 2013

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Miia C. D'Agostino ("D'Agostino"), was the sole beneficiary of the

Bruno D'Agostino Trust ("Trust"), which owned a multifamily residential property

located at 72-74 Lexington Avenue in Cambridge, Massachusetts (the "Property").  The

Property was insured under the terms of a policy ("Policy") that had been issued by the

defendant, Federal Insurance Company ("Federal"), to Bank of America, N.A. ("Bank of

America" or "Bank"), the trustee of the Trust.  On December 9, 2008, the Property

sustained substantial damage as a result of a fire.  Although Federal made certain

payments to the plaintiff in order to compensate her for losses sustained as a result of the

fire, the parties were unable to reach an agreement regarding the amount of additional

compensation, if any, to which D'Agostino is entitled under the Policy.  Accordingly,

D'Agostino brought the instant action against Federal, claiming that the defendant

breached its contractual obligations by failing to pay all of the amounts due under the

Policy.  She also has asserted claims against Federal, pursuant to Mass. Gen. Laws ch.

93A and Mass. Gen. Laws ch. 176D, for unfair and deceptive acts or practices.[1]

The matter is presently before the court on Federal's two Motions for Protective

Order (Docket Nos. 25 and 26), as well as on Federal's Emergency Motion to Enforce

Settlement Agreement (Docket No. 27) and its Motion for Sanctions Pursuant to Rule

11(c)(2) (Docket No. 55).  By its motions, Federal contends that the parties reached a

binding settlement agreement during the course of negotiations between their respective

counsel.[2]  Accordingly, Federal is seeking an order enforcing the parties' agreement, as

well as a protective order relieving Federal of any obligation to respond to or otherwise

engage in discovery.  In addition, Federal is seeking an order imposing sanctions against

plaintiff's counsel for his actions in filing an Application for Entry of Default against

---

[1] On March 27, 2013, D'Agostino amended her complaint in order to allege new facts against Federal and to assert claims against Bank of America.  However, at the time of the events giving rise to the dispute at the heart of the present motions, Bank of America was not yet a party to the litigation.

[2] In its earlier motion for a protective order, Federal argued that the parties were continuing to negotiate a settlement, and that their resources would be better spent finalizing an agreement instead of conducting discovery.  (See Docket No. 25 at 4-6).  Subsequently, however, Federal stated that the parties had reached an enforceable settlement, and that it was entitled to a protective order while the parties finalized the terms of a release agreement.  (See Docket No. 26 at 4-7).

Federal following its failure to respond to the plaintiff's Second Amended Complaint.

Federal argues that such sanctions are warranted because, at the time he filed the

Application, plaintiff's counsel knew not only that Federal had been vigorously defending

the action, but also that Federal's dispositive motion to enforce a settlement agreement

had been filed and was pending before the court.  Therefore, according to Federal, there

was no legal or factual support for a default, and no legitimate purpose for filing the

Application.

D'Agostino denies that the parties ever reached a final settlement, or that they

entered into an enforceable agreement.  She also contends that Federal has had no

legitimate basis for withholding discovery or for seeking a protective order, and she

requests that the court sanction Federal by directing it to compensate D'Agostino for the

expenses she has incurred as a result of having to oppose Federal's motions and pursue

discovery from the defendant.  With respect to Federal's motion for sanctions,

D'Agostino argues that her Application for Entry of Default met all the requirements of

Fed. R. Civ. P. 55(a) and otherwise complied with the law, and that it is Federal's motion

for sanctions which is improper under the Rules of Civil Procedure.  Accordingly, she

requests that the court deny Federal's motion and award D'Agostino her reasonable

attorney's fees incurred in connection with the motion for sanctions.

The parties have submitted numerous exhibits, as well as an affidavit from

plaintiff's counsel.  Additionally, the parties presented oral arguments at a hearing before

this court on April 5, 2013.  The material facts are not in dispute, and neither of the

parties has requested an evidentiary hearing.  After consideration of the parties'

submissions and their oral arguments, and for the reasons detailed below, this court finds

that although the parties had agreed on a number of critical points relating to a settlement,

they never reached agreement on all of the terms which defendant had deemed at the time

to be essential.  Therefore, this court recommends to the District Judge to whom this case

is assigned that "Defendant Federal Insurance Company's Emergency Motion to Enforce

Settlement Agreement" (Docket No. 27) be DENIED.  In light of this court's conclusion

that no enforceable settlement agreement existed, Federal's two motions for a protective

order (Docket Nos. 25 and 26) are hereby DENIED.  Finally, this court finds that

sanctions are not warranted against either party at this time.  Therefore, "Defendant

Federal Insurance Company's Motion for Sanctions Pursuant to Rule 11(c)(2)" (Docket

No. 55), as well as the plaintiff's requests for sanctions and for reimbursement of

attorney's fees, also are DENIED.  Federal shall file a responsive pleading to the Second

Amended Complaint within 14 days of the date of this decision.

## II.  <u>STATEMENT OF FACTS</u>[3]

D'Agostino filed the instant litigation against Federal in state court, and on August

31, 2012, Federal removed the matter to this court on the basis of diversity of citizenship.

(See Docket No. 1).  In December 2012, following the parties' production of their initial

disclosures, the parties engaged in mediation, which was unsuccessful.  (See Goren Aff.

¶¶ 8, 10, 13).  However, counsel for the parties continued to communicate, both over the

phone and through email correspondence, regarding a possible settlement.  (See id. ¶¶ 13,

16; Def. Ex. A at 1-13).  The fundamental question raised by the defendant's motions is

whether the parties reached an enforceable settlement agreement during the course of

those communications.

The record demonstrates that on January 16, 2013, plaintiff's counsel, Richard

Goren, contacted Federal's counsel, Alexandra Power and Jennifer Sheehan, and

suggested, among other things, that the parties arrange a time to discuss "a possible

resolution with Chubb."[4]  (Def. Ex. A at 1).  Counsel for the parties spoke by telephone

---

[3]  The facts are derived from pleadings filed in this case; the exhibits attached to Federal's Emergency Motion to Enforce Settlement Agreement (Docket No. 27) ("Def. Ex. __"); the exhibits attached to the Plaintiff's Combined Opposition to Federal's Two Motions for Protective Order and its Emergency Motion to Enforce Settlement Agreement (Docket No. 34) ("Pl. Ex. __"); and the Affidavit of Richard A. Goren (Docket No. 35) ("Goren Aff."), as amended by the plaintiff's Notice of Errata (Docket No. 41).  Additionally, this court has considered the exhibits attached to Federal's motions for protective order.  However, because those documents are also included among the exhibits attached to the defendant's Emergency Motion to Enforce Settlement Agreement, there is no need to cite to them separately.

[4]  Although Federal is the writing company for the Policy and the named defendant in this case, the plaintiff has used the name "Chubb" to refer to the defendant in its correspondence. Accordingly, this court has used the names "Federal" and "Chubb" interchangeably for purposes

the following day regarding the possibility of a settlement.  (Goren Aff. ¶ 16).  Significantly, during the conversation, Attorney Goren emphasized that as a condition to any settlement, D'Agostino would need to retain the ability to pursue claims against Bank of America, which was not a party to the lawsuit, for alleged breach of its fiduciary duties to the Trust.  (Id.).  He also expressed some concern about whether a settlement with Chubb would bar D'Agostino's potential claims against the Bank under the doctrine of res judicata.  (Id.).  For their part, Federal's attorneys indicated that as part of any settlement, the defendant would require an agreement from D'Agostino to indemnify Chubb from any claims or liabilities arising out of or relating to the litigation.  (Id.).

## D'Agostino's Settlement Proposal

Following counsel's conversation, Attorney Power asked to see D'Agostino's settlement demand in writing, and on January 17, 2013, Attorney Goren sent the following email to Chubb's counsel:

> The Plaintiff offers to settle solely with Chubb for $1.15 Million in cash payable at close of settlement.  Chubb would get a release from Ms D'Agostino both individually, as beneficiary of the Bruno D'Agostino trust and as successor in interest to the Bruno D'Agostino trust.
>
> The Plaintiff must be able to continue to litigate with Bank of America.
>
> I find it odd, to say the least, that in our conversation earlier today you insisted that in such a separate settlement my client would have to indemnify Chubb from any claims the bank may make.

---

of this decision.

You will recall my email leading to our discussion today in *haec verbae*:

Please produce immediately the documents Chubb contends comprise the insurance policy contract on the D'Agostino Trust Property.

In our conversation, you adamantly insisted you would not do so, going on that you had produced the policy in your initial disclosures.  I reminded you that your production was not batestamped.  I reminded you that I had attached documents that some percipient witnesses indicated were part of the contract.  But Chubb refuses to identify the documents it contends comprise the contract of insurance.

Yet with breathtaking chutzpah Chubb suggests it is appropriate for the plaintiff to hold chubb harmless from obligations to the bank.  Put yourself in the other side's shoes.

The offer of settlement is not open ended time wise.  It is open to be accepted until Monday January 21st at noon.

(Def. Ex. A at 6-7).  Thus, D'Agostino proposed a settlement conditioned upon Federal's agreement to pay her $1.15 million in cash and the plaintiff's ability to assert claims against Bank of America.  Moreover, the plaintiff indicated that she would not be willing to enter into any settlement which would require her to indemnify Chubb for any obligations that it might have to the Bank or for any claims that the Bank might assert against it.

On January 18, 2013, Federal's counsel, Attorney Power, wrote to Attorney Goren and informed him that the January 21 deadline for responding to D'Agostino's settlement offer was a federal holiday, and that the defendant would need at least one week to determine an appropriate response.  (Id. at 8).  Attorney Goren responded in an email

dated January 20, 2013.  (Id. at 10).  Therein, plaintiff's counsel stated, "Ms. D'Agostino always is interested in hearing from Chubb.  You should let me know whether Chubb will settle at $1.15 Million for a release of Chubb; after all that was that (sic) was demanded at the mediation."  (Id.).

In late January, D'Agostino once again confirmed that she would be willing to accept a response to her settlement demand even though the original deadline of January 21 had passed.  Thus, on Friday, January 25, 2013, Federal's attorney notified Attorney Goren that she expected to have a response from her client on Monday, and that she appreciated the plaintiff's patience.  (Id. at 12).  Attorney Goren replied that same day stating, "I will look forward to hearing from you."  (Id. at 13).  Several days later, on January 28, 2013, Attorney Goren sought an extension of time to respond to a pending motion that Federal had filed with the court while he awaited word from the defendant. As Attorney Goren wrote in an email to Federal's counsel dated January 28, 2013:

> While I await word from you as to Chubb's response to the plaintiff's settlement proposal, I note on my calendar that tomorrow is the last day to file an opposition to Chubb's January 15, 2013 Motion to Stay.
>
> I am inclined to put off a response to your motion but will only do so with your agreement.
>
> Please advise as soon as possible, ideally in the next hour or so, so that I can plan accordingly.
>
> If the response is to be put off, I will prepare and file a joint motion putting off the response date to say one week.

(Id. at 14; Goren Aff. ¶ 20).  Federal replied that it would assent to an extension, and

Attorney Goren filed a joint motion for an extension of time to respond to Federal's

motion.  (Docket No. 19).  Therein, counsel advised the court that "there is good cause

for this short extension as [the parties] continue to discuss a settlement."  (Id.).

In another communication dated January 28, 2013, Attorney Power informed

Attorney Goren that Federal was still working on D'Agostino's settlement demand, but

that she expected to have a response within the next few days.  (Def. Ex. A at 23).

Again, Attorney Goren responded that "I will wait for Chubb's response."  (Id.).  He also

notified the defendant that D'Agostino would be moving to amend her complaint in order

to add Bank of America as a defendant, and he served Federal with a supplemental

demand letter pursuant to Mass. Gen. Laws ch. 93A.  (Id. at 23-25).  By her letter, the

plaintiff  alleged, in essence, that Bank of America and Chubb, acting individually and in

combination, had engaged unfair and deceptive conduct which deprived D'Agostino of

insurance proceeds to which she was entitled under the Policy.  (See id. at 26-50).

Subsequently, on February 4, 2013, the plaintiff served interrogatories on Federal

and noticed the deposition of Brown and Dupont Forensic Consultants, LLC ("Brown and

Dupont"), a firm that had been retained by Federal to assist it in valuing certain of the

plaintiff's damages from the fire.  (Id. at 51-66; Def. Mot. to Enforce (Docket No. 27)

¶ 16).  However, in his email accompanying the discovery materials, Attorney Goren

stated, "I look forward to Chubb's response to settlement proposal albeit its dilatory

nature." (Def. Ex. A at 51).  Thus, D'Agostino remained willing to accept a response to

her settlement offer notwithstanding the delay and her decision to pursue discovery.

### Federal's Response to Plaintiff's Settlement Proposal

The next communication between the parties occurred on February 6, 2013, when

Federal's counsel, Attorney Power, sent the following email to Attorney Goren:

> In response to your client's demand for (sic) to resolve the above referenced
> matter, attached please find a release for your client's execution.  We would
> appreciate it if your client could execute the release as soon as possible so
> that we can avoid having to seek another extension on your opposition to
> our motion to stay.

(Id. at 67).

Attached to Attorney Power's email was a seven-page document, consisting of

eighteen separate paragraphs, entitled "Confidential Release and Settlement Agreement"

("Release").  (Def. Ex. B).  The first paragraph of the Release provided, among other

things, for the payment of $1.15 million from Federal to D'Agostino.  (See id. ¶ I).  It

also provided, in substance, that D'Agostino would release and discharge Federal "and all

of its heirs, executors, administrators, estates, officers, directors, shareholders,

employees, agents, servants, attorneys, assigns, affiliates, subsidiaries and divisions,

predecessors and successors in interest, trustees and legal representatives, and any and all

persons, firms and corporations in which Federal . . . may have an interest, and their

insurers (hereinafter collectively referred to as 'RELEASEES')" from any claims that she

has or may have against Federal in the future relating to the fire which occurred at the

Property.  (See id.).   As described below, Federal argues that the inclusion of these

provisions in the Release constituted an acceptance of D'Agostino's settlement offer and resulted in an enforceable settlement agreement, while D'Agostino contends that Federal's inclusion of numerous additional terms rendered the Release a counteroffer which was never accepted by the plaintiff.

In addition to the provisions regarding payment and discharge of liability, the Release addressed such issues as the use of the Release in judicial proceedings, choice of law, termination of the litigation, and non-disparagement.  (See id. ¶¶ VII-VIII, X, XIII). While some of these provisions contained standard contract terms, other provisions contained more substantive obligations.  For example, but without limitation, the Release included a detailed confidentiality clause under which D'Agostino and her attorney would agree, in part,

> that her representations and promises of strict confidentiality, as set forth above, go to the essence of and form a valuable part of the consideration for RELEASEES to make the Settlement Payment and enter into this Agreement, and should [D'Agostino] violate the strict confidentiality provisions in this paragraph, [D'Agostino] shall pay to RELEASEES the amount of the Settlement Payment, $1,150,000, as liquidated damages for breaching this Agreement.

(Id. ¶ XII).  Additionally, the Release contained an indemnification clause which provided as follows:

> [D'Agostino] expressly stipulates and agrees, in consideration for the aforesaid payment, to indemnify, defend, and forever hold harmless the RELEASEES against any and all further claims, actions, or demands that hereafter are asserted against the RELEASEES on account of the occurrences of December 9, 2008 and/or the claims which were alleged or which could have been alleged or asserted by [D'Agostino] in the above-referenced Civil Action.

11

(Id. ¶ III).   Therefore, despite Attorney Goren's insistence that D'Agostino was unwilling to enter into a settlement agreement which would require her to indemnify Chubb for any claims that the Bank might assert against it, the Release contained language which could potentially impose such an obligation on the plaintiff.

### Plaintiff's Response to the Release

Attorney Goren responded to the proposed Release in an email to Federal's counsel dated February 6, 2013.  (Def. Ex. A at 69; Goren Aff. ¶ 25).  Therein, D'Agostino's counsel thanked Attorneys Power and Sheehan for transmitting the $1.15 million release, but expressed confusion as to whether Chubb had accepted his client's settlement offer.  (Id.).  As Attorney Goren wrote:

> When I glanced at the release it was not completely clear to me whether Chubb had accepted Ms. D'Agostino's settlement proposal...So before I put pen to paper in reworking the form of release, I seek assurance of Chubb's intent.  Ms. D'Agostino's settlement offer of $1.15 Million was explicitly conditioned upon her being able to pursue the bank for damages.

(Id.).  He then quoted the settlement proposal that had been set forth in the first two paragraphs of his January 17, 2013 email to Chubb's attorneys, and stated, "[i]f that is not acceptable to Chubb, I will not waste my time in drafting."  (Id.).

Federal's counsel replied immediately to Attorney Goren's email, stating, "[a]s the release reads, Federal Insurance Company is the only named 'Releasee.'"  (Def. Ex. A at 72; Goren Aff. ¶ 26).  However, she did not address any of the additional terms contained in the Release.  (See id.).

12

The next significant communication between the parties occurred on February 11, 2013, when Attorney Power contacted Attorney Goren regarding a subpoena and Notice of Deposition that D'Agostino had served on Brown and Dupont.  (See Def. Ex. C at 7-21).  In her email to the plaintiff's counsel, Attorney Power stated, "it is my understanding that our matter is respectively settled and that any depositions will not be going forward as scheduled.  Please confirm by response to this email." (Def. Ex. C. at 7).  Thus, Federal believed that the parties had reached an agreement which would resolve all of D'Agostino's claims against it.

Attorney Goren replied to Attorney Power's email on February 12, 2013, stating in relevant part as follows:

> I do believe the plaintiff is about to conclude a settlement with Chubb.  However, the plaintiff will be continuing the litigation with Bank of America and among other things anticipates filing her rule 15 motion to amend and to add Bank of America as a defendant.
>
> I anticipate getting a draft settlement agreement to you in the next few days; and I cannot imagine not wrapping up our deal well before the deposition.  While the plaintiff's claims against Chubb will be dismissed with prejudice, the case itself will continue.  Depending on when the bank is brought in, I may continue the date for testimony.

(Id. at 37).  Accordingly, as of mid-February 2013, Attorney Goren also believed that the parties had come to an understanding, and that after the parties finalized a written settlement agreement, the claims against Federal would be "dismissed with prejudice[.]" What remained unclear at that time was whether and to what extent D'Agostino would be willing to accept the terms of Federal's proposed Release.

The record shows that subsequently, D'Agostino not only rejected Federal's Release, but also abandoned further efforts to finalize a settlement.  Thus, on February 15, 2013, Attorney Goren spoke to Attorney Sheehan and informed her that the proposed Release was not acceptable.  (Goren Aff. ¶ 29).  Moreover, although he notified Federal's counsel that he had prepared a draft of a settlement agreement, Attorney Goren declined to forward the draft to the defendant for review.  (See Def. Ex. C at 42-49).  Instead, on February 19, 2013, Attorney Goren sent Federal's counsel a letter in which he stated, "[o]n February 6, 2013, Chubb emailed to the plaintiff a 'Confidential Release and Settlement Agreement' pursuant to which Chubb would pay Ms. D'Agostino a total of $1.15 Million on the conditions and terms set forth therein.  Including this page signed by me and the following constitute plaintiff's response."  (Id. at 45).  The so-called "response" included a request that Chubb produce the Policy, as well as a series of questions seeking Chubb's views as to its obligations under the Policy and the nature of the contractual relationship, if any, between Chubb and Bank of America as it related to the plaintiff's claims.  (See id. at 46-49).  According to Attorney Goren, the questions were aimed at assessing "the reasonableness of Chubb's February 6th settlement proposal as well as its acceptability to [D'Agostino.]"  (Id. at 46).  Therefore, notwithstanding his prior statements that "the plaintiff is about to conclude a settlement with Chubb" and that "the plaintiff's claims against Chubb will be dismissed with prejudice,"  Attorney Goren refused to discuss the terms of a final settlement agreement.  (See id. at 37).

Thereafter, counsel for the parties continued to communicate about the possibility of finalizing a written agreement, but their communications grew increasingly contentious and ultimately broke down.  (See, e.g., id. at 53-54, 67-68, 76-77).  Additionally, the parties disagreed about the propriety of pursuing discovery and other litigation related activities in light of the status of their negotiations.  D'Agostino insisted that no settlement had been reached, and she proceeded to seek discovery relating to her claims against Federal.  (See id. at 67-68, 78-89, 91-120; Goren Aff. ¶¶ 31, 38).  She also eventually moved for the entry of default against Federal after the defendant failed to respond to the filing of a Second Amended Complaint.  (See Docket No. 46).  Federal responded to the plaintiff's discovery efforts by filing its two motions for protective order, and subsequently its motion to enforce the parties' alleged settlement agreement. Federal also opposed the motion for entry of default, which was denied.  (See Docket Entry dated 05/13/2013).  By its motions, Federal asserts that the parties reached a binding settlement agreement on February 6, 2013, when Federal sent D'Agostino the proposed Release containing its agreement to pay D'Agostino $1.15 million and naming Federal as the only releasee.  For her part, D'Agostino asserts that there is not and never has been an agreement to settle with Chubb, and that there is no basis for delaying the litigation.  (See Def. Ex. C at 134; Goren Aff. ¶ 37).

Additional factual details relevant to this court's analysis are set forth below where appropriate.

## III.  ANALYSIS

A.    **Standard of Review**

The critical issue raised by Federal's motions is whether the parties reached an enforceable settlement agreement.  The court has "an inherent power to supervise and enforce settlement agreements entered into by parties to an action pending before the court."  Dankese v. Defense Logistics Agency, 693 F.2d 13, 16 (1st Cir. 1982).  "Thus, a party to a settlement agreement may seek to enforce the agreement's terms when the other party refuses to comply."  Fid. & Guar. Ins. Co. v. Star Equip. Corp., 541 F.3d 1, 5 (1st Cir. 2008).  Where, as here, the material facts are not in dispute, it is up to the court to determine whether a binding agreement has been reached.  See Moore v. La-Z-Boy, Inc., 639 F. Supp. 2d 136, 140 (D. Mass. 2009) ("Whether a purported contract contains the necessary elements for enforceability is (ordinarily) a question of law reserved for the court.") (citing Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 709, 592 N.E. 2d 1289 (1992)).   Because this matter arises under the court's diversity jurisdiction, the question of whether the parties entered into an enforceable settlement agreement must be determined in accordance with Massachusetts contract law.  See Fid. & Guar. Inc. Co., 541 F.3d at 5 (applying Massachusetts contract law in diversity action involving challenge to enforcement of a settlement agreement).

In order to form a contract under Massachusetts law, "[a]n offer must be matched by an acceptance.  A counteroffer proposing a term that is materially different from that contained in the original offer constitutes a rejection of the offer and negates any agreement."  Kennedy v. JP Morgan Chase Nat'l Corp., No. 10-CV-11324-RGS, 2011

WL 1576569, at *2 (D. Mass. Apr. 26, 2011) (internal citation omitted).  Moreover, "[i]t is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement."  Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878, 724 N.E. 2d 699, 703 (2000).  Thus, while "[i]t is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract[,]" in order for an enforceable contract to exist, the parties must have reached an agreement on all of the essential terms.  See id.  As described below, although the parties agreed on certain essential matters, they failed to reach agreement on all the material terms of a settlement. Therefore, this court concludes that each of the defendant's motions should be denied.

### B.      Failure to Reach an Enforceable Settlement Agreement

Federal contends that an enforceable settlement agreement was created on February 6, 2013, when its counsel sent Attorney Goren the Release for his client's execution.  In particular, the defendant argues that because the Release contained an agreement by Federal to pay D'Agostino $1.15 million, and provided for the release of the plaintiff's claims against Federal, it constituted an acceptance of the plaintiff's settlement offer and resulted in a binding contract.  (See Def. Emer. Mot. (Docket No. 27) at 12-18).  D'Agostino denies that any binding agreement occurred on February 6 or at any other time during the course of the parties' communications.  According to D'Agostino, no settlement could have been reached because the plaintiff's proposed compromise did

17

not constitute an "offer," and because any alleged offer had expired by February 6, 2013. (See Pl. Opp. Mem. (Docket No. 34) at 11-14). She also contends that the Release was a counteroffer rather than an acceptance because it contained significant additional terms beyond those set forth D'Agostino's proposal, and she argues that the Release cannot be enforced because it was never executed by the plaintiff. (See id. at 7-11, 14-15). For the reasons that follow, this court finds that the plaintiff made Federal a valid offer of settlement, and that Federal's response to the offer was timely. However, because this court also finds the response was a counteroffer, which was never accepted in full by the plaintiff, this court concludes that there is no enforceable settlement agreement.

## Existence of an Offer

A threshold issue raised by the plaintiff is whether there was ever a settlement offer. Under Massachusetts law, "[a]n offer is the manifestation of willingness to enter into a bargain made in such a way as to justify the other person in understanding that his assent will conclude the agreement." I & R Mech., Inc. v. Hazelton Mfg. Co., 62 Mass. App. Ct. 452, 455, 817 N.E. 2d 799, 802 (2004). D'Agostino argues that in this case, there was no manifestation of the plaintiff's willingness to enter into a deal because the proposal set forth in Attorney Goren's January 17, 2013 email to Federal was merely "an invitation to Chubb to creatively address plaintiff's complicated legal concerns." (Pl. Opp. Mem. at 13). Therefore, she asserts that the proposal was not sufficiently complete and definite to constitute a valid offer. (See id. at 13-14).

18

This court finds that the plaintiff's characterization of her proposal lacks merit, and that the proposal constituted a firm offer to enter into a settlement agreement.  In his January 17 email, Attorney Goren described the plaintiff's proposal as an "offer[] to settle" and set forth explicit conditions for reaching a bargain.  As described above, those conditions included a cash payment of $1.15 million from Federal to Chubb, which would be due "at close of settlement," as well as the requirement that the plaintiff retain the ability "to continue to litigate with Bank of America."  (See Def. Ex. A at 6-7). Moreover, at the end of the email, Attorney Goren warned Federal that "[t]he offer of settlement is not open ended time wise" and "is open to be accepted until Monday January 21st at noon."  (Id. at 7).  This unambiguous language was more than adequate to convey D'Agostino's willingness to strike a bargain and to justify Federal's conclusion that its acceptance would result in an agreement.

The plaintiff's suggestion that her proposal was nothing more than an invitation to discuss the plaintiff's legal concerns is belied by the plain language of the January 17, 2013 email.  Not only did the email convey explicit settlement terms, but it also lacked mention of any legal concerns.  While Attorney Goren demanded that Chubb produce the documents it contended comprised the Policy on the Property, and accused Chubb of "breathtaking chutzpah" for suggesting that D'Agostino agree to indemnify Chubb for any obligations to the Bank, there is nothing in his email to suggest that there were any complicated legal matters that needed to be resolved or that D'Agostino wanted to discuss any such matters with the defendant.  (Id. at 6-7).  The only reasonable reading of the

19

email is that it reflected a desire to resolve the litigation by entering into a settlement

agreement.  The plaintiff's effort to characterize it as something other than a settlement

offer lacks any support in the record.

Finally, this court is not persuaded by D'Agostino's argument that Attorney

Goren's January 17 email "is not an 'offer' because it does not specify 'the completeness

of the terms of the suggested bargain.'"  (Pl. Opp. Mem. at 13 (citation omitted)).  That

argument is based on comment c to the Restatement (Second) of Contracts § 26 (1981),

which specifically addresses price quotations and has no apparent relevance to the facts

of this case.  As comment c reads:

> c.  *Quotation of price.*  A "quotation" of price is usually a statement
> of price per unit of quantity; it may omit the quantity to be sold, time
> and place of delivery, terms of payment, and other terms.  It is
> sometimes associated with a price list or circular, but the word
> "quote" is commonly understood as inviting an offer rather than as
> making one, even when directed to a particular customer.  But just as
> the word "offer" does not necessarily mean that an offer is intended,
> so the word "quote" may be used in an offer.  In determining
> whether an offer is made relevant factors include the terms of any
> previous inquiry, <u>the completeness of the terms of the suggested</u>
> <u>bargain</u>, and the number of persons to whom a communication is
> addressed.

(emphasis added).  However, this case does not involve a price quotation, and there is

nothing in the January 17, 2013 email indicating that D'Agostino's proposal was intended

as an invitation to make an offer rather than a firm offer of settlement.  Therefore, this

court finds that Attorney Goren's January 17, 2013 communication constituted a valid

settlement offer.

### Timeliness of Federal's Response

D'Agostino also argues that there can be no agreement because any offer had expired and could not be accepted on February 6, 2013, when Chubb responded by sending the draft Release.  (Pl. Opp. Mem. at 11-13).  "It is hornbook law that an offeree's power of acceptance vanishes at the time specified in the offer, and if no deadline is prescribed, at the end of a reasonable time."  Mathewson Corp. V. Allied Marine Indus., Inc., 827 F.2d 850, 853 (1st Cir. 1987) (quotations and citations omitted). It also is settled that the court must look to the objective facts and conduct of the parties in assessing the timeliness of an acceptance.  See id. (it is an "established principle that contracts depend on objective manifestations of consent" (quotations and citation omitted)).  This court finds that the objective facts presented in this case demonstrate that Federal's response to D'Agostino's settlement offer was timely.

The plaintiff argues that Federal's response was untimely because any offer of settlement expired on January 21, 2013 at noon.  (Pl. Opp. Mem. at 11).  As described above, the original offer provided that "it [was] not open ended time wise" and was only "open to be accepted until Monday January 21st at noon."  (Def. Ex. A at 7).  However, the undisputed facts also establish that throughout the latter part of January and into February 2013, Attorney Goren repeatedly agreed to keep the settlement offer open despite the defendant's stated inability to meet the January 21 deadline and its repeated delays in formulating a response to the plaintiff's proposal.  (See Def. Ex. A at 8, 10, 12-13, 23, 51).  In fact, on January 28, 2013, Attorney Goren filed a motion in which he

informed the court that the parties were continuing to negotiate a settlement.  (See Docket

No. 19).  Even as late as February 4, 2013, Attorney Goren sent an email to Federal's

counsel in which he stated that he "look[ed] forward to Chubb's response to settlement

proposal albeit its dilatory nature."  (Def. Ex. A at 51).  Therefore, the evidence

establishes that D'Agostino waived the January 21 deadline, and that Federal's response,

which came only two days after Attorney Goren's February 4 communication, occurred

within a reasonable time.  See McCarthy v. Tobin, 429 Mass. 84, 88-89, 706 N.E. 2d

629, 633 (1999) (finding that defendant's words and conduct signified her waiver of

deadline for signing purchase and sale agreement, and that plaintiff's subsequent tender

of the signed agreement was timely).

### Nature of Federal's Response

D'Agostino also argues that to the extent there was an offer, there was no

agreement by the parties because Federal never accepted the offer.  Instead, according to

D'Agostino, Federal's transmittal of a Release containing "different terms constituted a

counter-offer and thereby terminated the defendant's power to accept the original offer."

(Pl. Opp. Mem. at  4 (quotations and citations omitted)).  This court agrees that the

defendant's decision to send a Release containing additional material terms rendered its

response a counteroffer which could only become binding upon the plaintiff's

acceptance.   It is undisputed that on February 6, 2013, Federal replied to D'Agostino's

settlement offer by sending her a seven-page Release, along with an email requesting that

the plaintiff "execute the release as soon as possible[.]"  (See Def. Ex. A at 67; Def. Ex.

22

B).  Although the Release was consistent with the plaintiff's offer to the extent it

provided for a $1.15 million payment to D'Agostino and the release of the plaintiff's

claims against Federal, it contained numerous additional terms beyond those set forth in

the plaintiff's settlement offer.  (See Def. Ex. B).  "A reply to an offer which purports to

accept it but is conditional on the offeror's assent to terms additional to or different from

those offered is not an acceptance but is a counter-offer."  Restatement (Second) of

Contracts § 59 (1981).  See also McGurn v. Bell Microproducts, Inc., 284 F.3d 86, 89

(1st Cir. 2002) (plaintiff's alteration of defendant's offer letter "constituted a rejection of

that offer and created a counteroffer").  By asking D'Agostino to sign a document that

was conditional upon D'Agostino's assent to numerous additional terms, Federal rejected

the plaintiff's offer and created a counteroffer.  See Ismert & Assocs., Inc. v. New

England Mut. Life Ins. Co., 801 F.2d 536, 541 (1st Cir. 1986) (defendant rejected

plaintiff's offer and created a counteroffer by transmitting to plaintiff a release that

differed from the release proposed by the plaintiff, along with a letter seeking plaintiff's

signature on the substituted release).

        Federal acknowledges that the Release contained various additional terms.

Nevertheless, it argues that the Release constituted an acceptance because it expressed

Federal's agreement on the only two material terms that had been articulated by the

plaintiff, and all other matters were merely subsidiary.  (Def. Emer. Mot. at 16).  This

argument is not persuasive.  Where the parties have reached agreement on all material

matters, the existence of unresolved subsidiary matters will not preclude enforcement of

the contract.  See Goren v. Royal Investments Inc., 25 Mass. App. Ct. 137, 141, 516 N.E. 2d 173, 176 (1987).  Here, however, the Release contained certain additional terms that were essential to a settlement and could not be characterized as "subsidiary."  Therefore, Federal's response to D'Agostino's offer did not create a binding agreement.  See Cmty. Builders, Inc. v. Indian Motorcycle Assocs., Inc., 44 Mass. App. Ct. 537, 556, 692 N.E. 2d 964, 976-77 (1998) ("It is not enough if parties negotiating have agreed upon certain important terms if there has been no agreement on other essential elements of the undertaking" (quoting Geo. W. Wilcox, Inc. v. Shell E. Petroleum Prod., Inc., 283 Mass. 383, 390, 186 N.E. 562, 565 (1933)).

As described above, the Release was not limited to standard, boilerplate provisions.  It also contained provisions which had not been included in the original offer, and which sought to impose significant obligations upon the plaintiff.  For example, the Release contained a lengthy confidentiality provision that imposed strict requirements on the plaintiff, including an obligation to forfeit the entire amount of the $1.15 settlement payment if she were to violate its terms, even absent evidence of any harm to the defendant.  (See Def. Ex. B ¶ XII).  Moreover, as set forth in the Release, the plaintiff's "representations and promises of strict confidentiality . . . go to the essence of and form a valuable part of the consideration for [Federal] to make the Settlement Payment and enter into this Agreement[.]"  (Def. Ex. B ¶ XII).  Accordingly, the express language of the document demonstrates that the confidentiality provision was an "essential and inducing feature of the contract" and was therefore material to a settlement agreement.  See

Kennedy, 2011 WL 1576569, at *3 n.5 (explaining that "[i]n the law of contracts, a material term is 'an essential and inducing feature of the contract[].'") (quoting Buchholz v. Green Bros. Co., 272 Mass. 49, 52, 172 N.E. 101, 102 (1930)).

This court also finds that Federal's inclusion of an indemnity provision introduced a material term which rendered the Release a counteroffer.  As detailed above, the indemnity provision would have required D'Agostino to indemnify Federal against claims relating to the December 9, 2008 fire at the Property.  (See Def. Ex. B ¶ III).  Therefore, as the plaintiff argues, "[i]f the Bank were to make a claim against Chubb as a result of plaintiff's claims against the Bank, under the Draft Release Chubb would be entitled to indemnification from plaintiff."  (Pl. Opp. Mem. at 10).  However, Attorney Goren had made it clear at the time he conveyed the plaintiff's settlement offer on January 17, 2013 that D'Agostino was unwilling to enter into an agreement which would require her to indemnify Chubb for any claims which Bank of America might assert against Chubb or any obligations that Chubb might have to the Bank.  (Def. Ex. A at 6).  He reiterated this position following his receipt of the Release, in a letter to Federal's counsel dated February 22, 2013.  As Attorney Goren wrote in his letter, "[i]n previous communications I believe I made clear, and I repeat herein, there will be no separate settlement with Chubb pursuant to which Ms. D'Agostino will hold Chubb harmless from any claims or

liabilities from third parties." (Def. Ex. C at 68).  Thus, the proposed Release varied

materially from D'Agostino's original offer, thereby making it a counteroffer.[5]

To the extent Federal now contends that it did not consider these matters essential

to a settlement with the plaintiff and would have been willing to dispense with them in

order to reach an agreement, its argument is insufficient to support enforcement of a

settlement agreement.  "It is . . . a basic rule of contract law that both the offer and

acceptance must be communicated if a binding agreement is to be formed."  Kennedy,

2011 WL 1576569, at *3 n.6.  If Federal actually believed at the time it sent the Release

that the additional terms contained therein were immaterial, it could have conveyed that

information to the plaintiff or simply accepted the offer on the terms set forth in Attorney

Goren's January 17, 2013 email correspondence.  Instead, Federal sent the Release to

D'Agostino's counsel and asked that the plaintiff "execute the release as soon as

possible[.]" (Def. Ex. A at 67).  Because the Release contained material matters beyond

those addressed in D'Agostino's offer, Federal effectively rejected the offer and

terminated its power to accept it.  See Ismert & Assocs., Inc., 801 F.2d at 541 ("A

---

[5] The plaintiff argues that the Release contained additional terms, including the requirement that D'Agostino execute a Stipulation of Dismissal with prejudice and that she release Federal's "affiliates," which also were material and made the Release a counteroffer. (Pl. Opp. Mem. at 7-10).  The plaintiff asserts that these provisions were inconsistent with the requirement that she retain the ability to pursue claims against Bank of America because a dismissal with prejudice could potentially preclude her claims against the Bank pursuant to the doctrine of res judicata, and because the inclusion of "affiliates" could arguably be interpreted to include the Bank.  (Id.).  In light of this court's determination that there were other material terms in the Release which rendered it a counteroffer, it unnecessary at this time to address the merits of these arguments.

counter-offer made upon receipt of an offer generally terminates the party's power to accept the original offer.").

### Plaintiff's Response to the Counteroffer

Having determined that Federal's February 6, 2013 response to D'Agostino's offer amounted to a counteroffer, the question remains as to whether the parties reached a meeting of the minds with respect to the essential terms of a settlement.  The evidence shows that plaintiff's counsel initially viewed Federal's response as an acceptance of the offer, and manifested an intent to be bound by the terms of the Release to the extent that it called for a $1.15 million payment to D'Agostino and dismissal of the plaintiff's claims against Federal with prejudice.  However, because the record also demonstrates that there was no meeting of the minds with respect to all of the material terms contained in the defendant's counteroffer, this court is constrained to conclude that no binding agreement was reached.

As an initial matter, to the extent the plaintiff argues that there can be no enforceable agreement because D'Agostino never signed the Release, her argument is not persuasive.  (See Pl. Opp. Mem. at 14).  The absence of a written contract alone is not sufficient to defeat enforcement of a settlement agreement.  See Quint v. A.E. Staley Mfg. Co., 246 F.3d 11, 15 (1st Cir. 2001) (finding that plaintiff "cannot escape the consequences of her agreement because she spoke but did not write").  "If . . . the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an

already binding contract."  <u>Goren</u>, 25 Mass. App. Ct. at 140, 516 N.E. 2d at 175.  Thus, the issue is whether the parties agreed upon all material terms notwithstanding the absence of a signed agreement.

The record reveals that the parties did agree on the amount of the settlement payment and the dismissal of Federal from the litigation. Thus, after receiving Federal's response to the offer on February 6, 2013, Attorney Goren thanked Federal's counsel "for transmitting the $1.15 Million release."  (Def. Ex. A at 69).  He also requested confirmation, before he "put pen to paper in reworking the form of release," as to whether Federal had also accepted the condition that D'Agostino be able to pursue Bank of America for damages.  (<u>Id.</u>).  On February 12, 2013, after confirming that Federal was the only entity named as a Releasee in the Release, Attorney Goren sent another email to Federal's attorneys in which he expressed his belief that D'Agostino was "about to conclude a settlement with Chubb" and stated that "I cannot imagine not wrapping up our deal well before the deposition" of Brown and Dupont.  (Ded. Ex. C at 37).  He also indicated that he would be "getting a draft settlement agreement to [Federal] within the next few days" and confirmed that while the plaintiff intended to pursue claims against Bank of America, "the plaintiff's claims against Chubb will be dismissed with prejudice[.]"  (<u>Id.</u>).  It is apparent from the language of these emails that as of February 12, 2013, Attorney Goren viewed the Release as an acceptance of D'Agostino's settlement offer, and believed that the parties only needed to work out the terms of a final written agreement in order to wrap up the "deal."  Therefore, the parties reached a

meeting of the minds with respect to the amount of the settlement payment and the dismissal of Federal from the litigation with prejudice.

Attorney Goren's later communication, in which he claimed that D'Agostino needed more information in order to assess "the reasonableness of Chubb's February 6th settlement proposal" was disingenuous at best. (See Def. Ex. C at 46). It is undisputed that it was Attorney Goren who first reached out to Federal in order to discuss "a possible resolution with Chubb," and that it was the plaintiff who made the initial written settlement offer. (Def. Ex. A at 1, 6-7). It is also undisputed that Attorney Goren continued to hold the settlement offer open well after the original deadline expired. (See id. at 10, 12-14, 23, 51). The suggestion that D'Agostino needed more information before she could determine the reasonableness of any settlement is entirely inconsistent with the actions of her counsel. It is also inconsistent with the statements made by Attorney Goren in his February 6 and February 12 email communications.

Unfortunately for Federal, however, this court cannot conclude that the parties reached a binding agreement. Despite Attorney Goren's expressed belief that the parties had a "deal," his email communications were insufficient to constitute an acceptance of Federal's counteroffer. Significantly, Attorney Goren did not address the contents of the proposed Release in either his February 6 or his February 12 email, and he never indicated that D'Agostino would be willing to accept the additional material terms contained therein. (See Def. Ex. A at 69; Def. Ex. C at 37). Instead, on February 15, 2013, Attorney Goren contacted Federal's counsel and told her that the Release was

unacceptable.  (Goren Aff. ¶ 29).  Therefore, this court cannot find as a matter of law that there was an agreement on all the material terms of a settlement.  <u>Compare</u> <u>Fecteau Benefits Group, Inc. v. Knox</u>, 72 Mass. App. Ct. 204, 213, 890 N.E.2d 138, 146 (2008) (affirming lower court's determination that parties' email exchange resulted in a binding settlement agreement where "the e-mail exchange included all material terms, a deadline for acceptance, and acceptance without equivocation").  Accordingly, Federal is not entitled to relief on its motion for enforcement of a settlement agreement or on its motions for a protective order, and is not relieved of its obligations to respond to the Second Amended Complaint or otherwise participate in discovery.[6]

### C.    D'Agostino's Request for Sanctions

In connection with her opposition to the motions for a protective order, D'Agostino requests that the court impose sanctions on the defendant in the form of an order directing Federal to reimburse the plaintiff for the expenses she incurred as a result of Federal's motions and her efforts to obtain discovery.  (Pl. Opp. Mem. at 20-27).  The plaintiff argues that such sanctions are warranted because the defendant failed to confer with the plaintiff before filing her motions for protective order, to turn over coverage information as required by Mass. Gen. Laws ch. 176D, or to comply with D'Agostino's

---

[6]  In light of this court's conclusion that Federal is not entitled to a protective order because the parties never reached a binding settlement agreement, this court declines at this time to address the other arguments raised by the plaintiff in opposition to the motions for protective order.

repeated requests for discovery.  (See id.).  Based on the record before it, this court finds
that no sanctions are warranted.

As an initial matter, the record indicates that Federal has produced coverage
information, and that D'Agostino has been able to obtain Policy information from Bank
of America as well.  (See Goren Aff. ¶¶ 5, 10, 27).  The record also demonstrates that the
parties engaged in significant settlement negotiations, and that for much of the time the
action has been pending in this court, Federal has had a reasonable expectation that the
matter would be resolved without the need for further discovery.  Moreover, notwith-
standing this court's conclusion that the parties failed to reach agreement on the material
terms of a settlement, this court finds that Federal had a good faith basis for its assertion
that the parties entered into a binding agreement in February 2013.  Its decision to resist
the plaintiff's efforts to obtain further discovery, and to await a ruling from this court
before complying with D'Agostino's demands for additional information, were justified.

Finally, it is far from clear that Federal failed to confer with the plaintiff before
filing her motions for protective order.[7]  Even if it were assumed that Federal neglected to
do so, this court would not find that sanctions were warranted.  The undisputed facts

---

[7]  In his Affidavit, Attorney Goren stated that Federal failed to confer, as required by
Local Rule 37.1, prior to filing its motions for protective order. (Goren Aff. ¶¶ 35, 39-40).
However, among the attachments that Federal submitted with its motions were certifications
stating that Federal did confer with the plaintiff in an effort to resolve its disputes, prior to filing
the motions for protective order.  (See Docket No. 25-8 attached to Docket Nos. 25 and Rule
26(c) Certification attached to Docket No. 26). Therefore, the evidence relating to whether
Federal complied with Local Rule 37.1 is disputed.

demonstrate that by the time Federal filed its motions, the parties' negotiations had

broken down and their communications had grown contentious.  Accordingly, Federal

acted appropriately when it sought the court's intervention, and the plaintiff's request for

sanctions is denied.

### D.  Federal's Motion for Sanctions

Finally, Federal has moved for sanctions against Attorney Goren, pursuant to Fed.

R. Civ. P. 11, based on the plaintiff's filing of an Application for Entry of Default in

which D'Agostino requested that the Clerk enter a default against Federal pursuant to

Fed. R. Civ. P. 55(a).  D'Agostino filed the Application after Federal failed to respond to

the Second Amended Complaint.  This court denied the Application, and ruled that

Federal was not required to file a responsive pleading pending a ruling on her Emergency

Motion to Enforce Settlement Agreement.  (Docket Entry dated 05/21/2013).

Federal argues that the Application was frivolous because, at the time Attorney

Goren filed it, he knew that Federal had vigorously defended the claims against it

throughout the litigation, and knew that Federal's Emergency Motion to Enforce

Settlement, which was potentially dispositive of D'Agostino's claims against Federal,

was pending before the court.  (Def. Mot. for Sanctions (Docket No. 55) at 1-2).

Accordingly, Federal seeks an order imposing sanctions upon plaintiff's counsel pursuant

to Fed. R. Civ. P. 11(b).  D'Agostino argues that the Application for Entry of Default met

all necessary requirements, and was proper in light of the defendant's failure to file an

answer or defensive motion to the amended complaint, or to seek permission from the

court not to do so.  (Pl. Opp. to Sanctions (Docket No. 59) at 1-2, 9-15).  She also argues that Federal's motion for sanctions is baseless and lacks compliance with the applicable Rules.  (Id. at 16).  Therefore, D'Agostino not only opposes the motion, but also requests that the court sanction Federal by awarding her reasonable attorney's fees incurred by D'Agostino in connection with Federal's motion.  (Id. at 16-17).

After consideration of the parties' arguments, both parties' requests for sanctions are denied.  While the court questions the wisdom of seeking a default against Federal at a time when its motion to enforce a settlement agreement was pending, this court is not prepared at this stage to impose sanctions against plaintiff's counsel.  Additionally, this court finds that Federal's decision to seek sanctions was not improper given the circumstances presented in this case, including D'Agostino's repeated indications that the parties were at least on the verge of completing a settlement.  Therefore, D'Agostino has not shown that she is entitled to an award of attorney's fees.

## IV.  CONCLUSION

For all the reasons described herein, this court recommends to the District Judge to whom this case is assigned that "Defendant Federal Insurance Company's Emergency Motion to Enforce Settlement Agreement" (Docket No. 27) be DENIED.[8]  Moreover, in

---

[8] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly

light of this court's conclusion that no enforceable settlement agreement existed,

Federal's two motions for a protective order (Docket Nos. 25 and 26) are hereby

DENIED.  Finally, this court finds that sanctions are not warranted against either party at

this time.  Therefore, "Defendant Federal Insurance Company's Motion for Sanctions

Pursuant to Rule 11(c)(2)" (Docket No. 55), as well as the plaintiff's requests for

sanctions and for reimbursement of attorney's fees, also are DENIED.  Federal shall file a

responsive pleading to the Second Amended Complaint within 14 days of the date of this

decision.

                                      / s / Judith Gail Dein
                                      Judith Gail Dein
                                      United States Magistrate Judge

---

indicated that failure to comply with this Rule shall preclude further appellate review.  <u>See</u> <u>Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 275 (1st Cir. 1988); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 604-605 (1st Cir. 1980); <u>United States v. Vega</u>, 678 F.2d 376, 378-79 (1st Cir. 1982); <u>Scott v. Schweiker</u>, 702 F.2d 13, 14 (1st Cir. 1983); <u>see also</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  <u>Accord</u> <u>Phinney v. Wentworth Douglas Hosp.</u>, 199 F.3d 1, 3-4 (1st Cir. 1999); <u>Henley Drilling Co. v. McGee</u>, 36 F.3d 143, 150-51 (1st Cir. 1994); <u>Santiago v. Canon U.S.A., Inc.</u>, 138 F.3d 1, 4 (1st Cir. 1998).