UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MIIA C. D'AGOSTINO,<br><br>    Plaintiff,<br><br>    v.<br><br>FEDERAL INSURANCE COMPANY and,<br>BANK OF AMERICA, N.A.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 12-11628-DJC<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                       March 3, 2014

### I. Introduction

Plaintiff Miia C. D'Agostino ("D'Agostino") has filed this lawsuit against Defendants Federal Insurance Company ("Federal") and Bank of America, N.A. (the "Bank") seeking, *inter alia*, to recover treble damages under Mass. Gen. L. c. 93A for unfair and deceptive business acts or practices ("Count II") and under c. 176D for unfair and deceptive acts or practices conducted in the business of insurance ("Count III"). D. 40, Second Am. Compl. ("SAC"). The Bank has moved to dismiss Count II, asserting that the Bank cannot be liable under c. 93A because a trustee's actions do not constitute trade or commerce, D. 58 at 2, and Count III, claiming that the Bank is not engaged in the business of insurance and therefore is not liable under c. 176D. Id. For the reasons discussed below, the motion to dismiss is ALLOWED IN PART and DENIED IN PART.

## II. Standard of Review

To decide a motion to dismiss for failure to state a claim, the Court must determine if the well-pled facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). "The plaintiff need not demonstrate she is likely to prevail" at this stage, only that her claims are facially plausible. Garcia- Catalán v. United States, 734 F.3d 100, 102 (1st Cir. 2013). Plausible means "more than a sheer possibility," and permits the Court to incorporate a contextual analysis of the facts. Id. at 102-03 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). This determination requires a two-step inquiry. Id. at 103. First, the Court must distinguish the factual allegations from the conclusory legal allegations in the complaint. Id. Second, taking plaintiff's allegations as true, the Court should be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678); Ocasio–Hernández v. Fortuño–Burset, 640 F.3d 1, 11 (1st Cir. 2011).

In deciding a motion to dismiss, the Court is limited to the "facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint, and matters of which judicial notice may be taken." Nollet v. Justices of the Trial Court, 83 F. Supp. 2d 204, 208 (D. Mass. 2000). Dismissal is appropriate only if D'Agostino's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

## III. Factual Allegations

The Bank has been the trustee of the Bruno V. D'Agostino trust (the "Trust") since 2007, under "its brand name," U.S. Trust. SAC ¶ 8. D'Agostino has been the sole beneficiary of the Trust, which was terminated in 2009 following D'Agostino's 31st birthday. Id. ¶ 9. A three-

family dwelling located at 72-74 Lexington Avenue in Cambridge was property of the Trust until the Trust's dissolution. Id. ¶ 12. D'Agostino lived in one of the three units, while the Bank leased out the other two apartments. Id. ¶¶ 14-15. D'Agostino contends that the house's interior and exterior structures included unique architectural details that had been designed by her father, a renowned architect. Id. ¶ 12. The property contained a collection of fine art, sculptures, antiques, extensive gardens and a working greenhouse. Id. ¶¶ 12-13, 16.

D'Agostino alleges that the Bank appraised her home prior to August 1, 2008 for "the express purpose of determining the full replacement insurance value of the house," including the cost to update the structure to comply with municipal and state building codes. Id. ¶ 18. The Bank assigned an estimated "fair cash value" of $1,033,000 to the house, excluding the land. Id. ¶ 17.

The Bank sells professional trust administration services to the public under the brand name U.S. Trust and manages over 5,000 trusts. Id. ¶¶ 8, 21. Prior to August 1, 2008, the Bank entered into an insurance agreement with Federal, under which Federal would issue a $10 million blanket commercial policy to cover the Bank's trust properties, including "commercial, residential, and agricultural" properties. Id. ¶ 19. On August 1, 2008, Federal issued this policy (the "Master Policy") to cover all 5,000 trust properties managed by the Bank, including the D'Agostino Trust. Id. ¶ 23. The Master Policy included coverage for, *inter alia*, the full replacement cost of the house, personal property and fine arts, loss of rents and recreation of personal records. Id. ¶ 24. D'Agostino alleges that the Bank assigned the replacement value of $883,118 to the Lexington Avenue residence. Id. ¶ 25. D'Agostino further alleges the Bank assigned the value of $618,232 to her personal property, but did not ever conduct any inventory

of the property. Id. ¶ 26. The Bank has no record of how it arrived at these values, which both were stated on the property's certificate of insurance under the Master Policy. Id. ¶¶ 25, 30.

     D'Agostino submitted insurance claims to Federal after a fire substantially damaged her home and personal property on December 9, 2008, rendering the home uninhabitable and forcing D'Agostino to move to temporary housing. Id. ¶ 29. In April 2009, Federal retained one of its consultants, Brown & Dupont, to provide an estimate for the cost to replace the house, as defined in the Master Policy. Id. ¶ 48. The Brown & Dupont report estimated the replacement cost to be $1,411,611.70. Id. ¶ 49. In August 2009, Federal paid this amount to the Bank, on behalf of D'Agostino, after the Bank and Federal agreed this was a fair amount. Id. ¶ 58. D'Agostino contends that the Bank purposefully failed to disclose that the Master Policy also provided coverage for the fine arts collection, gardens and living expenses separately from the structural replacement. Id. ¶¶ 45-47. D'Agostino alleges that the Bank "knowingly and intentionally falsely represented" to her that her insurance coverage was limited to the replacement values listed on her certificate of insurance, rather than the full $10 million maximum coverage of the Master Policy. Id. ¶ 45.

     D'Agostino corresponded with the Bank and Federal several times in an effort to obtain a copy of the Master Policy. Id. ¶¶ 56-57, 60. In the Spring of 2011, D'Agostino obtained an independent estimate that stated the cost to replace her home was approximately $1,900,000, almost $500,000 higher than Brown & Dupont's valuation. Id. ¶¶ 69, 71. On October 5, 2011, the Bank and Federal "jointly informed" that D'Agostino settle for the amount listed on the certificates of insurance, as "the Bank had reached a final agreement with [Federal] that the $1,411,612 payment for the house was acceptable." Id. ¶ 81. In 2011 and 2012, D'Agostino sent multiple written requests to the Bank and Federal asking for certain disclosures including an

explanation of the Master Policy, the dealings between the two companies and the underlying bases for the payments made and proposed settlement offers. Id. ¶ 77. The Bank did not provide any explanation regarding its dealings with Federal or the settlement negotiations. Id. ¶¶ 78-79.

D'Agostino claims that "the Bank sold to itself, delivered to [Federal], and foisted on its beneficiary, a certificate of insurance for the Trust property covering only the materially understated replacement cost values for the house and the contents of the house." Id. ¶ 28. D'Agostino contends that the Bank is engaged in the business of insurance because it "issues over 5,000 insurance certificates each year and charges, and collects, premiums for those certificates." Id. ¶ 116. D'Agostino alleges that the Bank undervalued her property because it had a financial interest in its agreement with Federal regarding the Master Policy. Id. ¶ 34.

## IV. Procedural History

On May 16, 2012, D'Agostino commenced this action by filing a complaint in Suffolk Superior Court. D. 1 at 1. On August 2, 2012, D'Agostino filed an amended complaint seeking treble damages against Federal under Mass. Gen. Laws c. 93A and 176D. D. 1-1 at 1-8. Federal filed a notice of removal on August 31, 2012. D. 1. On March 27, 2013, D'Agostino filed the SAC, which added the Bank as a co-defendant and included claims for breach of contract ("Count I"), unfair or deceptive business practices under Mass. Gen. L. c. 93A ("Count II") and unfair or deceptive insurance claim settlement practices under Mass. Gen. L. c. 176D ("Count III"). D. 40. On May 28, 2013, the Bank moved to dismiss Counts II and III for failure to state a claim under Fed. R. Civ. Pro. 12(b)(6). D. 57. The Court heard oral argument on the motion and took this matter under advisement. D. 117.

**V.     Discussion**

**1.     D'Agostino Has Failed to Allege a Plausible Claim Under Mass. Gen. L. c. 176D against the Bank because the Bank Is Not in the Business of Insurance**

*1.     To Prevail on Her Claim under Mass. Gen. L. c. 176D against the Bank, D'Agostino Must Plausibly Allege that the Bank is "in the Business of Insurance"*

The Bank claims that D'Agostino has not alleged a plausible basis for relief through Count III because the Bank is not in the business of insurance, which is a necessary element of any claim arising under Mass. Gen. L. c. 176D. D. 58 at 8-11. Chapter 176D provides that "[n]o person shall engage in this commonwealth in any trade practice which is defined in this chapter as . . . an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." Mass. Gen. L. c. 176D § 2. "Person" is defined as an individual, corporation, partnership or "any other legal entity or self insurer which is engaged in the business of insurance, including agents, brokers, and adjusters . . . ." Id. § 1. The Bank asserts that there are insufficient allegations to support a claim that the Bank has engaged in the business of insurance, either on its own or in a joint venture with Federal. D. 58 at 9.

*2.     D'Agostino Has Not Plausibly Alleged that the Bank Is in the Business of Insurance*

Massachusetts courts have found that companies in the "business of insurance" include any entities which make "profit driven business decisions about premiums, commissions, marketing, reserves and settlement policies and practices." Poznik v. Mass. Med. Prof'l Ins. Ass'n, 417 Mass. 48, 51 (1994).[1] Courts look to an entity's operational practices, not just its

---

[1] Poznik was superseded in part by statute, but only to the extent that Mass. Gen. L. c. 176D § 1 was amended in 1996 to include in the Massachusetts Insurers Insolvency Fund and any joint underwriting association within the definition of "person" for the purposes of c. 176D. See Wheatley v. Mass. Ins. Insolvency Fund, 465 Mass. 297, 300 (2013). Massachusetts courts

corporate purpose, focusing on whether defendant has a contractual obligation to pay claims. See Liquor Liab. Joint Underwriting Ass'n of Mass. v. Great Am. Ins. Co., No. 96-3127, 2003 WL 21048793, at *25 (Mass. Super. Ct. Apr. 14, 2003) ("LLJUA"); Morrison v. Toys R Us, 441 Mass. 451, 458 (2004) (holding that c. 176D does not apply to a self-insured corporation with internal claims management division, but no "contractual obligation" to pay claims); Hanley v. Walker, No. 03-2214-E, 2009 WL 1863683, at *14 (Mass. Super. Ct. June 23, 2009) (finding that defendants were not in the "'business of insurance' because there was no insurance policy through which they were contractually obligated to pay claims").

Courts also consider whether a company is regulated as an insurer by the Commonwealth. Id. In addition, evidence of a company's profit being "attributable to conscious and purposeful choices [the entity] made concerning premiums, marketing and settlement policies and practices, [are] all factors to be taken into account in applying the test set forth in Poznik." LLJUA, 2003 WL 21048793, at *26. Courts also consider whether the insurer assumes any "risk of loss." Poznik, 417 Mass. at 50-51. Entities which are in the business of "claim facilitation" as it pertains to managing the insurance risk for another entity, can fall within the reach of c. 176D. Miller v. Risk Mgmt. Found. of Harvard Med. Inst., Inc., 36 Mass. App. Ct. 411, 418-19, rev. denied, 418 Mass. 1104 (1994).

Even if an entity's function is to "minimize the ultimate exposure of an insurer," this entity is "not engaged in the business of insurance within the meaning of Chapter 176D," Mitzan v. Medview Servs., Inc., No. 98-01211, 1999 WL 33105613, at *12 (Mass. Super. Ct. June 16, 1999) (finding that third party contract specialists were not in business of insurance) (citing

---

continue to apply Poznik in evaluating whether an entity is in the "business of insurance." See Morrison, 441 Mass. at 455; Cortes v. Clinton Housing Auth., No. 10-0285-D, 2010 WL 5188457, at *2 (Mass. Super. Nov. 3, 2010).

Miller, 36 Mass. App. Ct. at 415), unless, for example, it had "ultimate control over determinations of eligibility and claim coverage and has unfettered discretion concerning the use of refunds from insurance companies." Id. (summarizing the holding in Zoppo v. John Hancock Ins. Co., No. 95-2646-C, 1996 WL 655742, at *4 (Mass. Super. Ct. Oct. 31, 1996)).

In this case, the Bank argues that it cannot be in the business of insurance given the absence of an insurance policy between itself and D'Agostino. D. 58 at 9. The Supreme Judicial Court's ruling in Morrison is illustrative on this point. In Morrison, the court explained that the impetus to enact c. 176D was to "discourage insurers from forcing claimants into unnecessary litigation to obtain relief" that is contractually owed to them. Morrison, 441 Mass. at 454 (citations omitted). The court determined that a corporation's decision to self-insure did not make it an insurer. Id. at 456. The plaintiff argued that the company violated the fair claim settlement requirements of c. 176D during the course of investigating and processing her negligence claim. Id. Finding no evidence of a contractual obligation for the company to pay the plaintiff's claims, the court held that the company was not liable under c. 176D. Id. at 458. The fact that the corporation had hired claims adjusters to internally process the employees' claims was insufficient to transform the company into an "insurer" under c. 176D, as the company's goal only was to manage its own risk. Id. at 456. The goal was not to profit commercially from selling policies or to avoid paying or settling claims as promised in those policies, which was the "legislative concern" behind the statute. Id. at 454-55.

Similar to Morrison, even as alleged by D'Agostino, the Bank's internal management of D'Agostino's claim did not transform the Bank into an insurer. The Bank correctly notes that D'Agostino has not alleged that D'Agostino purchased an insurance policy that obligated the

8

Bank to pay its claims.[2]  D. 58 at 9.  Rather, the SAC acknowledges Federal insured the contract, issued the policy and made an initial claims payment.  SAC ¶¶ 23, 118-119.  In addition, D'Agostino has not plausibly alleged that the Bank had any meaningful role in calculating premiums, commissions, reserves, or settlement policies and practices.  Poznik, 417 Mass. at 51.  There is no evidence that the Bank is "contractually obligated to pay claims" or regulated by the Commonwealth as an insurer.  Hanley, 2009 WL 1863683, at *14.  Although D'Agostino does allege that there was some "undisclosed deal" between the Bank and Federal, SAC ¶ 25, this allegation is insufficient to state a claim that the Bank somehow stands in the shoes of "any other legal entity or self insurer which is engaged in the business of insurance" for the purposes of a c. 176D claim.  That is, even accepting D'Agostino's allegations as true that there was some agreement between the Bank and Federal, such contention does not plausibly allege that the Bank was in the business of insurance.  Even if there was an "undisclosed agreement" between the Bank and Federal, D'Agostino has not alleged this agreement as one obligating the Bank to insure the Trust property, to pay D'Agostino the proceeds of an insurance policy, to set premiums, to bear risk, to manage claims or to engage in settlement practices.  See Morrison, 441 Mass. at 455; Poznik, 417 Mass. at 51.

D'Agostino alleges that the Bank, not Federal, evaluated her residence to estimate the full cost of replacement for the "express purpose" of determining its insurance coverage.  Id. ¶ 18.  She further alleges that the Bank "delivered" her certificates of insurance to her, id. ¶ 30, issued the certificates and collected the premiums for the 5,000 trusts it manages.  Id. ¶ 116.  However, D'Agostino cites no case law supporting the proposition that an entity's mere delivery of an

---

[2] The SAC does not assert that the Bank had a contractual obligation to pay the Trust's claims.  Rather, it states twice that the Bank "concealed the contractual obligations of Chubb owed to the Trust."  SAC ¶¶ 33, 85.

9

insurance certificate and role in the collection (but not regulation) of premiums is sufficient to establish that a defendant is in the "business of insurance."

Additionally, D'Agostino alleges that the Bank made several joint proposals to D'Agostino, on behalf of itself and Federal, to settle her claims.  Id. ¶¶ 75-76.  D'Agostino cites Lemos v. Electrolux North America, Inc., 78 Mass. App. Ct. 376, 382 (2010), for the proposition that the Bank may not escape c. 176D liability in a collaborative insurance venture simply because it was not the organization paying the claims.  Her allegations, however, are clearly distinguishable from the facts in Lemos, in which the parent company, a lawnmower manufacturer, owned a captive insurer, i.e., a separate insurance company formed to bear the risks of the parent company.  Id. at 376-77 & n.2.  In that case, the parent company was not liable under c. 176D because it was a separate corporate entity and, unlike its subsidiary, the captive insurer, was not under any contractual obligation to pay out claims or issue policies.  Id. at 381-82.  Thus, common ownership was insufficient to establish a collaborative insurance venture as to the parent company, even where the parent company had formed the independent subsidiary exclusively to conduct all its insurance business.  Id. at 388.  Here, the complaint does not allege a common ownership relationship or even support such an inference of the relationship as asserted in Lemos.

For all of the aforementioned reasons, the Court cannot conclude that D'Agostino has stated a plausible claim under Mass. Gen. L. c. 176D against the Bank, and, accordingly GRANTS the motion to dismiss as to Count III.

### 3. D'Agostino, However, Has Plausibly Alleged that the Bank Violated Mass. Gen. L. c. 93A

The Bank argues that D'Agostino has not alleged a plausible violation of c. 93A because the Bank's relationship with D'Agostino as her trustee was not in the scope of trade or

commerce. D. 58 at 5. Chapter 93A prohibits unfair or deceptive acts or practices, but only "in the conduct of any trade or commerce." Mass. Gen. L. c. 93A § 2. "Trade or commerce" is defined as including "the sale, rent, lease or distribution of any services and any property, tangible or intangible." Id. § 1.

D'Agostino "must allege some sort of transaction between the parties for liability to attach under [c. 93A]." L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc., 121 F. Supp. 2d 147, 152 (D. Mass. 2000). In general, courts apply a dual inquiry when determining whether parties are subject to 93A: "first, the court assesses whether the interaction is 'commercial' in nature, and second, it evaluates whether the parties were both engaged in 'trade or commerce,' and therefore acting in a 'business context.'" Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 22-23 (1997). Here, however, Massachusetts courts have provided guidance as to when the principal-trustee relationship falls within the scope of chapter 93A. In general, chapter 93A does not provide a cause of action for private grievances or internal disputes between business partners or parties in the same venture. Lattuca v. Robsham, 442 Mass. 205, 209 (2004). Because the principal-trustee relationship is usually private in nature, falling outside the "business context," courts generally find that "the actions of a trustee, executor, or administrator in executing fiduciary responsibilities do not constitute trade or commerce or involve the requisite commercial marketplace transactions to bring them within c. 93A." See Steele v. Kelley, 46 Mass. App. Ct. 712, 726 (1999) (citing Szalla v. Locke, 421 Mass. 448, 451-52 (1995)). However, where a professional trust manager sells its services to the public as part of its ordinary course of business, Massachusetts courts have found these professionals are engaged in commerce, and therefore liable under c. 93A. Quinton v. Gavin, 64 Mass. App. Ct. 792, 799 (2005). Accordingly, Steele and Lattuca "do not establish a rule that G.L. c. 93A claims

invariably are prohibited against trustees or other fiduciaries; rather, they are expressions of the general principle that violations of c. 93A must take place in the conduct of 'trade or commerce.'" Id. at 797. Instead, a plaintiff can state a c. 93A claim against a trustee where the defendant "advertise[s] and [sells] his services as a financial manager and self-styled 'independent trustee' to members of the public in the ordinary course of business." Id. at 799.

Cases decided since Quinton are in accord with this principle, finding that a national bank, "as trustee, was acting in a commercial context, and was therefore subject to the strictures of c. 93A." T.W. Nickerson, Inc. v. Fleet Nat. Bank, 73 Mass. App. Ct. 434, 449-50 (2009), rev'd in part on other grounds, 456 Mass. 562 (2010). Although the Bank suggests that T.W. Nickerson, Inc. is distinguishable because it dealt with a claim brought by a third party against the trustee and the beneficiaries of that trust, D. 58 at 7 n. 4, it at least stands for the proposition that a 93A claim can be stated against a trustee if it is acting in a commercial context.

Here, the SAC alleges several facts supporting a plausible inference that the Bank was acting in a commercial context and thereby engaged in trade or commerce. The Bank has been the trustee of the D'Agostino Trust since 2007. D. 40 ¶¶ 8-9. The three-family dwelling located at 72-74 Lexington Street in Cambridge, MA was property of the Trust and the Bank managed the property, leasing two of the units on the residential market. Id. ¶¶ 12, 14. D'Agostino alleges that on August 1, 2008, the Bank, as trustee appraised her home and assigned an estimated "fair cash value" of $1,033,000 to the house, excluding the land. Id. ¶ 17. D'Agostino also alleges the Bank had inspected her home previously for the purpose of obtaining the full replacement insurance value for the home, including the cost to update the building to current municipal and state codes. Id. ¶¶ 17-18. D'Agostino also alleges the Bank sells trust services under the brand name U.S. Trust, currently acts as a trustee for approximately 5,000 trusts and

advertises its trustee services. Id. ¶ 21. D'Agostino alleges that the Bank entered into an agreement with Federal to purchase a $10 million blanket commercial policy to cover the 5,000 trusts held by the Bank as trustee. Id. Given these allegations and the further contention that the Bank was allegedly engaged in an "undisclosed arrangement" with Federal in furtherance of its own financial interests that thereby harmed D'Agostino in the undervaluation of her property, see id. ¶ 27, the SAC sufficiently alleges that the Bank's relationship with D'Agostino went beyond a purely private venture. See Quinton, 64 Mass. App. Ct. at 797. At least as alleged, the volume of trusts sold and insured by the Bank cuts against its argument that this was a private non-commercial relationship, such as in Steele or Lattuca. Selling services to the commercial market, including trust administration services, meets the broad statutory definition of "trade or commerce." Mass. Gen. L c. 93A, § 1. In addition, the allegation that the Bank advertises its trust services to consumers further demonstrates its intent to place these trust services in the public marketplace. See Quinton, 64 Mass. App. Ct. at 799 (noting that defendant trustee advertised his services to the public).

For all these reasons, D'Agostino's allegations that the Bank's services as her trustee were conducted within trade or commerce are facially plausible and, therefore, this claim should proceed to discovery and resolution later on an undisputed record (at the summary judgment stage) or on a disputed record at trial.

## VI. Conclusion

For these reasons, the Motion to Dismiss, D. 57, is ALLOWED as to Count III and DENIED as to Count II.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

13